UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al.*,

        Debtor.

Case No. 6:07-bk-00761-ABB
Chapter 11
Jointly Administered

_____/

SONEET R. KAPILA, as CHAPTER 11
TRUSTEE for TRANS CONTINENTAL
AIRLINES, INC.,

        Plaintiff,

v.

Adv. P. No. 6:09-ap-_____

JOHN GOGGIN,

        Defendant.

_____/

## COMPLAINT

Plaintiff, Soneet R. Kapila, as the Chapter 11 Trustee ("Trustee" and/or "Plaintiff") for the bankruptcy estate of Trans Continental Airlines, Inc. ("TCA" and/or the "Debtor") in Case No. 6:07-bk-00762-ABB, by and through his undersigned counsel, files this Complaint to avoid and recover fraudulent transfers against John Goggin ("Defendant").

### NATURE OF ACTION

1. Defendant improperly received funds traceable to investors of TCA and the Trustee seeks to avoid and recover these transfers under the Bankruptcy Code, the

Florida Uniform Fraudulent Transfer Act, Fla. Stat. § 726.101, *et seq.* ("FUFTA"), and unjust enrichment.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. §§ 1334 and 157.

3. Venue is proper in this district under 28 U.S.C. § 1409.

4. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157 (b) (2) (A), (B), and (H).

## PARTIES

5. Plaintiff is the court-appointed Chapter 11 Trustee for TCA's bankruptcy estate.

6. Defendant is an individual residing in Chicago, Illinois.

## FACTUAL BACKGROUND

7. On March 1, 2007 (the "Petition Date"), Tatonka Capital Corporation, Integra Bank, National Association, American Bank of St. Paul, and First National Bank & Trust Company of Williston (collectively, the "Petitioning Creditors") filed against TCA an involuntary petition under Chapter 11 of the Bankruptcy Code.

8. On March 8, 2007, the Petitioning Creditors filed an emergency motion for appointment of a Chapter 11 trustee (Dkt. No. 5; the "Emergency Motion"). As set forth in the Emergency Motion, upon information and belief, TCA has been involved in one of the largest "Ponzi" schemes in the State of Florida based on fraudulent investments offered in connection with TCA, among other things.

9. On March 16, 2007, this Court entered its Order Directing the Appointment of Chapter 11 Trustee (Dkt. No. 24).

10. On March 27, 2007, the United States Trustee filed its Notice of Appointment of Trustee (Dkt. No. 28), appointing Plaintiff as the Chapter 11 Trustee for TCA.

11. On March 30, 2007, this Court entered its Order Approving the Chapter 11 Trustee's appointment (Dkt. No. 31).

12. On April 5, 2007, this Court entered its Order for Relief for TCA (Dkt. No. 39; the "Order for Relief").

13. On July 31, 2007, this Court entered its Order pursuant to which the TCA bankruptcy case was jointly administered with the bankruptcy case of Louis J. Pearlman ("Pearlman") (Dkt. No. 170 in Case Number 6:07-bk-00762-ABB).

## Pearlman And The Ponzi Schemes

14. For over twenty years, Pearlman was successful in raising millions of dollars based on false representations about companies affiliated with him, which companies include TCA and Transcontinental Airlines Travel Services, Inc. ("TCTS"). Pearlman represented to investors that those companies were successful companies. That was not true; to the contrary, TCA and TCTS existed only on paper.

15. In fact, Pearlman was operating "Ponzi" schemes.

## The EISA Program

16. From as early as 1989 through January 2007, TCA, by and through its president, Louis J. Pearlman, and other persons at TCA, raised in excess of $300 million

from hundreds of investors nationwide. TCA raised such funds from investors principally through the use of brokers, intermediaries, "middle men" and/or similar persons (collectively, the "Brokers") who had access to such investors. The Brokers in turn offered investors the "opportunity" to invest their funds into the "Employee Investment Savings Account" program allegedly maintained by TCA (the "EISA Program").

17. Upon information and belief, the EISA Program was touted by Pearlman, the Brokers, and other persons at TCA as being available solely to employees of TCA and their family and friends. However, upon information and belief, the investors solicited by Pearlman, the Brokers, and other persons at TCA were not, with a few exceptions, employees or family members of employees of TCA.

18. Upon information and belief, Pearlman, the Brokers, and other persons at TCA promised prospective and existing investors in the EISA Program that their investments would yield above-market interest rates because such monies were being invested through TCA, which was promoted as a financially strong and successful charter airline with a net worth of over $100 million. Upon information and belief, Pearlman, the Brokers, and other persons at TCA represented to existing and prospective investors in the EISA Program that TCA had significant banking relationships which enabled TCA to achieve these higher than market rates of return on its investments, which higher rates of return could be passed on to the investors.

19. Upon information and belief, Pearlman, the Brokers, and others at TCA made several representations to investors and prospective investors in the EISA Program

concerning the safety of the investments, including without limitation, that the funds (i) were secure and deposited into individual bank accounts with unique account numbers at United States financial institutions, (ii) were insured by the Federal Deposit Insurance Corporation (the "FDIC"), and (iii) were re-insured by either Lloyds of London or AIG Insurance. Upon information and belief, at all relevant times herein, Pearlman, among others with TCA, knew that these representations were false and misleading and were intended to induce such investors into transferring their monies to TCA.

20. In actuality, the funds were not deposited into individual bank accounts for the investors with individual account numbers. Moreover, the funds did not have FDIC insurance protection and there was no re-insurance from Lloyds of London, AIG Insurance, or any other insurance company. Further, the funds did not yield above-market interest rates.

21. Rather, the funds received from investors in the EISA Program were deposited into various bank accounts held in the name of TCA and thereafter disbursed to various parties, including millions of dollars to or for the benefit of the Pearlman and others, as opposed to remaining on deposit for such investors.

22. Upon information and belief, certain of the funds transferred by investors into the EISA Program were used to repay prior investors and/or pay interest to prior investors in the EISA Program. Certain of the "interest" payments were paid in profits -- *i.e.*, amounts in excess of the principal amount invested by the investors. The source of these "interest" payments was not from bona fide investments, but from investment funds received from other investors.

23. In fact, at Pearlman's plea hearing on March 4, 2008 before the United States District Court for the Middle District of Florida (the "Plea Hearing") in his criminal case, Case No. 6:07-CR-97-Orl-18DAB (the "Criminal Case"), Pearlman admitted that the EISA Program was a "Ponzi" scheme in that the money invested in the EISA Program was used to pay back earlier EISA investors. Pearlman further admitted that the EISA investments were also used as working capital for TCA, to pay Pearlman himself, to fund certain of Pearlman's affiliated entities, and to pay Brokers.

24. Upon information and belief, at all relevant times herein, Pearlman, among others, knew that the representations being made to the investors in the EISA Program concerning such investments were false and misleading and were intended to induce such investors into transferring their monies to TCA.

25. All payments to investors were made by check or wire transfer from TCA's bank accounts at various financial institutions. Each check was made payable to the investor by name.

26. Investors received from TCA quarterly statements, which detailed the status of their investments for the previous three months, including the amount of purported "interest" earned.

### The Bank Fraud Scheme

27. From as early as 2003 through January 2007, Pearlman, both individually and through various entities owned and/or controlled by Pearlman, borrowed in excess of $150 million in both secured and unsecured loans (collectively, the "Loans") from numerous banks and financial institutions nationwide, including the Petitioning Creditors,

HSBC Bank, Bank of America and First International Bank and Trust (collectively, the "Banks").

28. Upon information and belief, Pearlman created and circulated, including through and with the substantial assistance of others, offering memoranda and similar due diligence materials to one or more of the Banks in an effort to convince the Banks to make the Loans.

29. The due diligence materials that were prepared and delivered to the Banks in support of the applications for the Loans included, without limitation, financial statements for TCA and other of Pearlman's companies, financial statements of Pearlman individually, and audited financial statements and related reports from the auditing firm of Cohen & Siegel. Among other things, the financial statements for both TCA and Pearlman listed substantial assets and a corresponding substantial net worth for each of TCA and Pearlman.

30. In fact, as Pearlman admitted at the Plea Hearing in the Criminal Case, all or substantially all of the due diligence materials prepared and delivered to the Banks in support of the applications for the Loans was false and misleading. Among other things, neither TCA nor Pearlman actually had the substantial assets or net worth evidenced on such financial statements. Moreover, the auditing firm of Cohen & Siegel was a fiction. It simply did not exist.

31. At all relevant times hereunder, Pearlman and others knew or should have known of the false and fictitious nature of the financial and other information being

provided to the Banks in support of the Loans, and that such information was intended to induce one or more of the Banks into making the Loans to Pearlman and his companies.

### The TCTS Stock Program

32. Pearlman and others executed another scheme (the "TCTS Stock Program") to defraud investors of money and property by means of offering investments in an entity called "Transcontinental Airlines Travel Services, Inc." (*i.e.*, TCTS).

33. TCTS was incorporated in Delaware in 1981. In the 1980's, Pearlman and others began to sell TCTS stock to investors. TCTS shares were sold for $10 each with the representation that interest or dividends would be paid out at ten percent per year.

34. Sales of the TCTS stock continued into the 2000's.

35. The investments offered in TCTS were not legitimate investments, but were part of a "Ponzi" scheme by which money from later investors would be paid to earlier investors.

36. Pearlman and others solicited investors to purchase TCTS stock by means of misrepresentations. These misrepresentations included false claims that (i) each share of TCTS stock was worth $10; (ii) TCTS had significant assets; and (iii) TCTS was about to "go public."

37. Upon information and belief, Pearlman and others promised prospective and existing investors in the TCTS Stock Program that their investments would yield "interest" at above-market interest rates.

38. In fact, however, TCTS had no tangible assets. Additionally, in furtherance of the scheme, Pearlman and other failed to disclose to purchasers of TCTS

stock that TCTS became a dissolved corporation in Delaware in March 1999. Despite being a dissolved corporation, Pearlman and others continued to sell TCTS stock after the company became dissolved.

39. When investors purchased TCTS stock, the money from the purchase was deposited into a TCA account.

40. After investors purchased TCTS stock, Pearlman and others arranged for quarterly statements to be sent to investors, which quarterly statements misrepresented and overstated the value of the TCTS stock, including the amount of "interest" earned.

41. When TCTS investors received money from their TCTS "investment," the funds were transferred from TCA to the investor. All payments were made by check or wire transfer from TCA's bank accounts at various financial institutions. Each check was made payable to the investor by name.

### Transfers From TCA To Or For The Benefit Of Defendant As A TCTS Stock Investor

42. Defendant received significant payments from TCA in connection with the TCTS Stock Program.

A. **Four Year Transfers To Defendant From TCA**

43. In the four years prior to the Petition Date, TCA transferred to Defendant an amount equal to at least $270,496.41 (the "Four Year Payments") in connection with, upon information and belief, Defendant's investment in the TCTS Stock Program. The Four Year Payments are detailed in the attached **Exhibit A**, which is incorporated herein by reference.

44. As additionally reflected in **Exhibit B,** within four years preceding the Petition Date, TCA paid Defendant amounts in excess of Defendant's original investment in the TCTS Stock Program (the "Four Year Profit Payments" and/or the "Unjust Enrichment Payments").

45. The Four Year Payments were made within four years preceding the Petition Date and were made at a time when TCA was insolvent.

## COUNT I
## ACTUAL FRAUD – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS RECEIVED BY DEFENDANT UNDER 11 U.S.C. §§ 544(b)(1) AND 550 AND FLA. STAT. §§ 726.105(1)(a) AND 726.108

46. Paragraphs 1 through 45 inclusive are realleged and incorporated herein by reference.

47. This is an adversary proceeding to recover fraudulent transfers pursuant to 11 U.S.C. §§ 544(b)(1) and 550, and FUFTA.

48. Within four years prior to the Petition Date, TCA transferred the Four Year Payments to Defendant or for the benefit of Defendant.

49. Pursuant to 11 U.S.C. § 544(b), the Trustee may avoid any transfer of an interest of TCA in property transferred to Defendant that is voidable under applicable law (in this case under Fla. Stat. §§ 726.105(1)(a) and 726.108) by a creditor holding an unsecured claim.

50. The Four Year Payments were made by TCA with the actual intent to hinder, delay or defraud present and future creditors of TCA.

51. There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. § 502, who would have standing to assert a claim for relief under FUFTA.

52. Creditors have filed claims against TCA, whose claims arose before or after the Four Year Payments were made.

53. The Four Year Payments are avoidable, and should be avoided, pursuant to and under Fla. Stat. § 726.105(1)(a) and 726.108 and 11 U.S.C. § 544(b)(1).

54. Pursuant to 11 U.S.C. § 550(a), the recovery of property for the benefit of TCA's estate is authorized to the extent that the Four Year Payments are avoided under 11 U.S.C. § 544(b)(1) and FUFTA.

**WHEREFORE,** the Trustee demands judgment against Defendant as follows: (i) determining that the Four Year Payments were fraudulent and avoidable under 11 U.S.C. §§ 544(b) and 550 and FUFTA; (ii) avoiding the Four Year Payments and entering judgment in favor of the Trustee against Defendant for the value of the Four Year Payments, plus pre-judgment interest, post-judgment interest, and costs of suit; (iii) disallowing any claim that Defendant may have against TCA, or any debtor jointly administered with TCA, including, without limitation, pursuant to and as provided in 11 U.S.C. § 502(d); and (iv) for such other and further relief as the Court deems just and proper.

## COUNT II
## CONSTRUCTIVE FRAUD – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS RECEIVED BY DEFENDANT UNDER 11 U.S.C. §§ 544(b)(1) AND 550 AND FLA. STAT. §§ 726.105(1)(b), 726.106(1), AND 726.108

55. Paragraphs 1 through 45 inclusive are realleged and incorporated herein by reference.

56. This is an adversary proceeding to recover fraudulent transfers pursuant to 11 U.S.C. §§ 544(b)(1) and 550, and FUFTA.

57. Within four years prior to the Petition Date, TCA transferred the Four Year Profit Payments to Defendant or for the benefit of Defendant.

58. TCA did not received fair consideration in exchange for the Four Year Profit Payments transferred to Defendant or for the benefit of Defendant.

59. At the time of the Four Year Profit Payments, TCA was insolvent and remained insolvent continuously thereafter.

60. At the time of the Four Year Profit Payments, TCA was engaged in a business or transaction for which its remaining property constituted an unreasonably small amount of capital in relation to its business or the transaction.

61. At the time of the Four Year Profit Payments, TCA intended to incur, believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as they became due.

62. There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. § 502, who would have standing to assert a claim for relief under FUFTA.

63. Creditors have filed claims against TCA, whose claims arose before or after the Four Year Profit Payments were made.

64. The Four Year Profit Payments are avoidable, and should be avoided, pursuant to and under Fla. Stat. §§ 726.105(1)(b), 726.106(1), and 726.108(1)(a), and 11 U.S.C. § 544(b)(1).

65. Pursuant to 11 U.S.C. § 550(a), the recovery of property for the benefit of TCA's estate is authorized to the extent the Four Year Profit Payments are avoided under 11 U.S.C. § 544(b)(1) and FUFTA.

**WHEREFORE,** the Trustee demands judgment against Defendant as follows: (i) determining that the Four Year Profit Payments were fraudulent and avoidable under 11 U.S.C. §§ 544(b) and 550 and FUFTA; (ii) avoiding the Four Year Profit Payments and entering judgment in favor of the Trustee against Defendant for the value of the Four Year Profit Payments, plus pre-judgment interest, post-judgment interest, and costs of suit; (iii) disallowing any claim that Defendant may have against TCA, or any Debtor jointly administered with TCA, including, without limitation, pursuant to and as provided in 11 U.S.C. § 502(d); and (iv) for such other and further relief as the Court deems just and proper.

## COUNT III
## UNJUST ENRICHMENT

66. Paragraphs 1 through 45 inclusive are realleged and incorporated herein by reference.

67. This is a claim for unjust enrichment.

68. The Debtor conferred a benefit on the Defendant by making the Unjust Enrichment Payments.

69. The Defendant knowingly and voluntarily accepted and retained the benefit conferred by the Debtor.

70. The circumstances are such that it would be inequitable and unjust for the Defendant to retain the benefit conferred by the Debtor without paying the Trustee the value thereof.

71. The Defendant has been unjustly enriched at the expense of the Debtor's estate (and, ultimately, the Debtor's investors).

72. The Trustee is entitled to the return of those amounts in which the Defendant was unjustly enriched through disgorgement or any other appropriate remedy.

**WHEREFORE,** the Trustee demands judgment in his favor and against the Defendant in the amount of the Unjust Enrichment Payments, together with interest and costs, and for such further relief as the Court may deem just and proper.

## RESERVATION OF RIGHTS

The Trustee reserves the right to amend this Complaint to add additional claims that the Trustee may discover.

Dated: March 28, 2009

AKERMAN SENTERFITT

/s/ Denise D. Dell-Powell
Denise D. Dell-Powell, Esquire
Fla. Bar No. 0890472
Samual A. Miller, Esquire
Fla. Bar No. 34991
420 S. Orange Ave., Suite 1200
Post Office Box 231
Orlando, Florida 32802
Telephone: (407) 423-4000
Facsimile: (407) 843-6610
Email: Denise.DellPowell@akerman.com
   Samual.Miller@akerman.com

and

Michael I. Goldberg, Esquire
Florida Bar No.: 886602
Las Olas Centre II, Suite 1600
350 East Las Olas Blvd.
Ft. Lauderdale, FL 33301-2229
Phone: (954) 463-2700
Fax: (954) 463-2224
E-mail: Michael.Goldberg@akerman.com

**ATTORNEYS FOR PLAINTIFF**

# Louis J. Pearlman

Case No. 6:07-bk-00761-ABB
United States Bankruptcy Court
Middle District of Florida
Orlando Division

## EISA Investor - John Goggin - 4 Year

| Transaction Date | Client ID | Transaction Type | Bank Acct. | Check Date | Check No. | Withdrawals |
|---|---|---|---|---|---|---|
| 03/02/04 | 193 | Withdrawal | FNB-3122 | 03/11/04 | 15000 | $23,169.41 |
| 08/31/04 | 193 | Withdrawal-CLOSE ACCT | FNB-3122 | 09/14/04 | 16132 | 247,327.00 |
| | | | | | | $270,496.41 |

Kapila & Company

EXHIBIT A

# Louis J. Pearlman
Case No. 6:07-bk-00761-ABB
United States Bankruptcy Court
Middle District of Florida
Orlando Division

## EISA Investor - John Goggin

| Transaction Date | Client ID | Transaction Type | Bank Acct. | Check Date | Check No. | Deposits | Withdrawals | Withdrawals over Deposits |
|---|---|---|---|---|---|---|---|---|
| 09/01/89 | 193 | Purchase - Cert #502 | | | | 20,000.00 | - | 20,000.00 |
| 05/01/93 | 193 | Purchase - Cert #664 | | | | 10,000.00 | - | 30,000.00 |
| 07/01/94 | 193 | Purchase - Cert #746 | | | | 20,000.00 | - | 50,000.00 |
| 04/01/95 | 193 | Purchase - Cert #851 | | | | 8,000.00 | - | 58,000.00 |
| 03/02/04 | 193 | Withdrawal | FNB-3122 | 03/11/04 | 15000 | - | (23,169.41) | 34,830.59 |
| 08/31/04 | 193 | Withdrawal-CLOSE ACCT | FNB-3122 | 09/14/04 | 16132 | - | (247,327.00) | (212,496.41) |
| | | | | | | $ 58,000.00 | $ (270,496.41) | $ (212,496.41) |

### Recoverable Profits Paid Within the 4 Year Period/Unjust Enrichment Payments

| | | | | | | | Payment | Amount of Recovery |
|---|---|---|---|---|---|---|---|---|
| 08/31/04 | 193 | Withdrawal-CLOSE ACCT | FNB-3122 | 09/14/04 | 16132 | - | 247,327.00 | 212,496.41 |

Kapila & Company

**EXHIBIT B**